Warren J. Stapleton, 018646
OSBORN MALEDON, P.A.
2929 North Central Avenue
21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
wstapleton@omlaw.com

Attorneys for Charter School Capital

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Chapter 11 |
| **LUZ ACADEMY OF TUCSON, INC.,** | Case No. 4:14-bk-05944-BMW |
| Debtor. | **OBJECTION TO THE USE OF CASH COLLATERAL NOTICE THAT THE MAY 1, 2014 DOE PAYMENT IS NOT PROPERTY OF THE ESTATE, OR IN THE ALTERNATIVE MOTION TO EXCUSE TURNOVER** |

Charter School Capital ("CSC"), by and through undersigned counsel, filed its objection to Luz Academy of Tucson, Inc.'s ("Luz Academy" or the "Debtor") Emergency Motion for the Use of Cash Collateral. The cash collateral the Debtor seeks to use belongs to CSC by virtue of a pre-petition sale of the Debtor's receivables. To the extent that the Court believes that the Debtor had some interest in the May 1, 2014 payment that CSC is to receive from the state, CSC requests an order excusing it from turnover as a result of CSC's recoupment and/or setoff rights.

**I.    Factual and Procedural Background.**

**A. Background to the Luz Academy receivables sales.**

CSC helps charter schools across the United States solve their cash flow needs where state budget shortfalls or delays threaten the delivery of quality education. Typically, CSC purchases the receivable that the charter school is to receive from the

state government. CSC pays the sale price to the charter school, and then the charter school sends the state government agency a notice indicating that it has sold the receivable to CSC. When the money is due to the charter school from the state government, the government sends the money directly to CSC. In essence, CSC receives the payment that was due to the charter school because it has already paid those funds to the charter school.

The Arizona legislature contemplated this type of financing when it enacted the charter school statute. *See* A.R.S. § 15-183(S) (authorizing the assignment or pledge of charter school property). Arizona is not unique, and this type of funding is critical to the successful operation of thousands of charter schools throughout the United States. CSC and its investors have purchased over $600 million in receivables from charter schools. The certainty of repayment provided by the above mechanism is critical to continued funding of charter schools – not just by CSC, but by other financing sources as well. Thus, although the amounts at stake in this case are relatively small, the importance of this matter to charter school education is significant.

CSC typically pays approximately 85% of the anticipated receivable due to the school from the state government. Once CSC receives the payment from the state government, it applies that payment to the charter school's outstanding balance (as provided for in their contract) and remits the remaining balance that is due to the school. This amount is usually referred to as the "Deferred Purchase Price." The Deferred Purchase Price is subject to certain offsets that could arise by virtue of reductions the state might impose upon the school. (For example, if the school were to misrepresent its attendance that could reduce the amount paid by the state.)

On or about October 9, 2013, Luz Academy and CSC entered into that certain Receivables Purchase Agreement dated October 9, 2013 (the "RPA"). A copy of the RPA is attached hereto as Exh. A. The RPA sets forth the terms for CSC's purchases

2

of Luz Academy's receivables – those amounts due to the school from Arizona state education funding sources. The RPA makes plain that this purchase is an outright sale transaction that immediately transfers title of the receivable due to Luz Academy. *See* Exh. A, p. 8, § 2.01(g). The contract provides:

> The parties hereto intend that the conveyance of Seller's right, title and interest in and to the Receivables shall constitute a sale, conveying good title free and clear of any Liens, claims, defenses, encumbrances or rights of others from Seller to Purchaser, that the Receivables shall not be part of Seller's estate in the event of the insolvency, bankruptcy, or similar event with respect to Seller, and that Seller will have no interest in the Deposit Account or the Paying Agency Account, as applicable, or any collections on the Receivables held in the Deposit Account or the Paying Agency Account, as applicable. It is the intention of the parties hereto that the arrangements with respect to the Receivables shall constitute a purchase and sale of such Receivables and not a loan.

*Id.* The RPA provides for multiple sales, i.e., the sale of each payment to be received from the State of Arizona. Each sale transaction is separately denoted by a bill of sale ("Bill of Sale"). The transactions put in issue by Debtor's motion relate to the May 1, 2014 payment covered by the Bills of Sale dated February 6, March 12, and April 21, 2014.[1] *See* Exhs. B, C, and D attached hereto. Concurrently with the Bills of Sale, Luz Academy sent letters to the Arizona Department of Education indicating that the receivables had been sold to CSC and irrevocably directing the Arizona State Treasurer to distribute such property to CSC. *See* Exhs. E, F, and G. The letters all provided substantially the same thing:

> LUZ ACADEMY OF TUCSON, INC., as operator of LUZ-GUERRERO EARLY COLLEGE HIGH SCHOOL ("Seller") hereby notifies you that it has sold and assigned to CHARTER SCHOOL CAPITAL, INC. the amounts by the State of Arizona (the "State") under the Charter School Act, as amended, and the Charter Contract between the Seller and Sponsor, on or about JUNE 1, 2014 (as such payments may have been and/or may in the future be deferred, delayed,

---

[1] Although the March 6, 2014 bill of sale applies to a payment due June 1, 2014 and the April 21, 2014 bill of sale applies to a payment due June 30, 2014, they are set forth here because CSC owns the payments, having paid the purchase price for same on the respective closing dates. *See* Exh. A, p. 17, § 4.02(c)(ii) and p. 18, § 5.01(c)(ii).

3

> accelerated or otherwise rescheduled from time to time, in whole or in part) relating to state equalization payments or other amounts to which the Seller is entitled to receive from the State (but excluding monies from the classroom site fund or instructional improvement fund received by the Seller under A.R.S. Sections 15-185(J) or 15-979); as such payments may have been and/or may in the future be deferred, delayed, accelerated or otherwise rescheduled from time to time; and all proceeds thereof.

*See* Exh. F, p. 1. Each letter provided payment information so that the funds flow directly from the state to CSC. CSC also filed an appropriate UCC-1 covering these transactions indicating its ownership interest in same by checking the buyer/seller box on the form UCC-1. *See* Exh. H. Additionally, CSC has perfection by control, since the funds are directed to an account under CSC's direction and control.

The Debtor executed the last Bill of Sale on April 21, 2014 – two days before it filed for bankruptcy. Under the RPA and the Bill of Sale, the Debtor represented that it was not insolvent, nor would it be made insolvent, by the sale of the receivables. It also represented and warranted to CSC that it would not voluntarily file for bankruptcy or voluntarily discontinue operation of the charter school. *See* Exh. A, p. 11, § 3.03(b), p. 14, § 4.01(a)(ix) and Exh. B, p. 2 ¶ 2.c. Plainly those statements were inaccurate and misleading. Perhaps more importantly, where did the money go that was received by the Debtor in February, March and April (2 days before the bankruptcy)? Debtor provides no explanation for its pre-petition use of the funds.

### B. Debtor's Emergency Motion.

Through its emergency motion, Debtor seeks authority to use a $63,229[2] May 1, 2014 payment owned by CSC and payable by the state of Arizona under the RPA and the Bills of Sale. (There are other payments referred to in the Emergency Motion, but they are not covered by CSC's RPA or its Bills of Sale.) It should be noted that

---

[2] Debtor asserts that this amount is $63,299. This number does not conform to the amount projected by CSC and CSC reserves all rights with respect to the amount that might be received.

4

the Debtor does not have possession of the cash collateral it is seeking to use. The monthly equalization payment to be paid by the State Treasurer on May 1, 2014 is under the control of CSC pursuant to the RPA, the Bills of Sale, and the letters to the state of Arizona. Setting aside whether CSC's setoff rights or recoupment rights should prevent turnover of these funds, there is almost no attempt to provide adequate protection for the use of these funds.

Debtor's adequate protection offer consists of the following: (a) a continuing lien; (b) "segregation" of the proceeds from these funds; and (c) proper management and monthly reporting. *See* Dkt # 10, p. 4. None of these things provide any protection – let alone adequate protection. Taking them in inverse order, proper management and monthly reporting are required of all debtors – whether they have use of cash collateral or not. Proper management does not provide additional security against the loss or diminishment of the funds (or CSC's secured ownership position). Debtor's suggestion to segregate proceeds provides no protection because there are no proceeds that will be generated from these funds. This is apparent from the budget itself – which show no proceeds from non-governmental sources, i.e., the school does not really generate funds from operations. Finally, providing a continuing lien hardly provides adequate protection given the filed schedules and the budget. Under the budget, the Debtor(s) will lose almost $50,000 from operations. *See* Dkt #10, Exh. B. Further, the Debtor's schedules do not provide any sort of equity cushion. In fact, they show approximately $137,000 in assets and $3.2 million in liabilities. Thus, the offer to provide a continuing lien over an insolvent, and shrinking, estate does not satisfy the requirement to give value equal to the decrease in the secured creditors' positions. *See* 11 U.S.C. § 361. Indeed, CSC has reason to believe that the Debtor may face regulatory hurdles that could result in revocation of the school's charter. This could jeopardize the Debtor's entire reorganization. Thus, the Court can and should deny the motion on that basis alone.

Case 4:14-bk-05944-BMW    Doc 23    Filed 04/30/14    Entered 04/30/14 15:40:38    Desc
Main Document      Page 5 of 11

## II. Argument.

### A. The May 1, 2014 payment is owned by CSC.

The Debtor's motion to use cash collateral is in a slightly different position than the ordinary cash collateral motion. Unlike most cases, this Debtor does not own or control the funds it would like to claim as its cash collateral. As noted above, Luz Academy sold the receivable due from the state to CSC before the petition date. The language of the contract is crystal clear that CSC owns the receivable. *See* Exh. A, , p. 8, § 2.01(g). Indeed, the Debtor represented to the state of Arizona that it had irrevocably sold the receivable to CSC before the deadline. *See* Exhs. E, F, G. Accordingly, the state will directly pay CSC – the owner of the receivable – not the Debtor. Thus, for the Debtor to be able to use the cash collateral, CSC will have to pay those funds over to the Debtor after it receives them from the state of Arizona.

Section 542(a) requires turnover of property of the estate. It does not require turnover of property that is not property of the estate. *See, e.g., United States v. Whiting Pools*, 462 U.S. 209-211 (1983) (holding that pre-petition IRS levy did not transfer ownership as to defeat turnover); *Sovereign Bank v. Schwab*, 414 F.3d 450, 452-53 (3d Cir. 2007) (holding pre-petition taking of rents transferred ownership of right to receive rents). Here, by the plain language of the agreements between the parties, the Debtor does not own the receivable. *See* Exh. A, p. 8, § 2.01(g).[3] Indeed, Arizona statute provides that once a debtor has sold an account, the debtor does not retain a legal or equitable interest in the account. *See* A.R.S. § 47-9318(A).

In making a determination of whether a transfer of rights to payment is an absolute sale or a secured borrowing, courts have examined "all the facts and circumstances surrounding the transactions at issue." *In re Golden Plan*, 829 F.2d 705, 709 (9th Cir. 1986). *Accord Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602

---

[3] While it is true that CSC must remit the Deferred Purchase Price to the Debtor, nothing in the RPA or Bill of Sale requires that CSC use the funds it receives from the state to do so. The payment of the Deferred Purchase Price is a contractual obligation owed by CSC to the Debtor – and one that CSC will certainly honor in accordance with Section 542(a).

6

F.2d 538, 544 (3d Cir. 1979). In particular, courts have looked to "the substance of the relationship" and "not simply the label attached to the transaction." *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995). Here, the facts and circumstances establish that the receivables sale was a true sale.

First, the risk of loss on the receivable is virtually entirely borne by CSC. Where the credit risk that the rights to payment will not be paid by the obligors has been shifted from the transferor to the transferee, it indicates a true sale. *See, e.g., Nickey Gregory Company, LLC v. AgriCap, LLC*, 597 F.3d 591, 601-03 (4th Cir. 2010); *In re The Woodson Co.*, 813 F.2d 266, 271-72 (9th Cir. 1987). Here, CSC bears the risk of non-payment.

Second, and relating to the first, the risk of market fluctuations in the receivable is borne by CSC. Where the opportunity for gain or loss, that is, the risk that the value of the obligations transferred will fluctuate due to changes in the market, has been shifted from the transferor to the transferee, the transaction is more likely to be characterized as an absolute sale. *See, e.g., In re Bellanca Aircraft Corp.*, 56 B.R. 339, 374-76 (Bankr. D. Minn. 1985) (aircraft), *aff'd on this ground & rev'd on others*, 850 F.2d 1275 (8th Cir. 1988). Here, the state's decision on how much to pay (given factors such as performance and attendance) is outside of CSC's and the Debtor's control. After the sale of the receivable, CSC bears this risk of loss.

Third, the form of the transaction supports the idea that the pre-petition sale was a "true" sale. Courts have held that form is important in determining whether an agreement was a sale or secured loan, particularly where the parties to the agreement were sophisticated. *See In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 596-98 (D.N.J. 1986); *Golden Plan*, 829 F.2d at 709. Here there can be little question the form of the transaction indicates a sale. The transaction is a purchase agreement and is further documented by bills of sale. And, the obligor on the accounts

7

was notified of the sale of accounts and directed to pay same directly to CSC as owner of same.

Fourth, the intent of the parties was that the sale of the receivables effected an irrevocable sale. Where the parties intend a transaction to be a sale rather than a secured borrowing, their intent will be given effect. *See, e.g., Golden Plan*, 829 F.2d at 708 n.2; *In re Reeves*, 65 F.3d 670, 674 (8th Cir. 1995); *In re Yeary*, 55 F.3d 504, 507 (10th Cir. 1995). Here, the language of the contract and the performance of the parties indicate their intent was a sale of the receivable. In fact, the Debtor specifically and irrevocably directed the state to send the proceeds to CSC because the receivable had been sold. *See also* A.R.S. § 47-9318(A) (debtor retains no legal or equitable interest in sold account).

Finally, some courts have indicated that if the transferor (the school) is the servicer of the transferred rights to payment, or if the transfer is not recorded, then the transfer is more likely to be characterized as a secured borrowing. *See e.g., In re Mid Atlantic Fund, Inc.,* 60 B.R. 604, 608 (Bankr. S.D.N.Y. 1986); *In re Alda Commercial Corp.,* 327 F. Supp. 1315, 1318 (S.D.N.Y. 1971). Here, the school does not service the receivables. Rather, CSC services the receivables. And, CSC recorded its interest in a UCC-1 filing and the Debtor notified the state (the receivable payor) that it had sold the receivable to CSC. These circumstances also support the conclusion that the Debtor sold the May 1, 2014 payment from the state of Arizona to CSC.

In short, CSC purchased the May 1, 2014 receivable pre-petition. The May 1, 2014 receivable is not property of the Debtor's estate. Accordingly, the Debtor should not be able to utilize CSC's property as cash collateral.

**B. Use of the May 1, 2014 payment as cash collateral is inconsistent with CSC's recoupment rights.**

Even if the Court were to find that the Debtor has some legal or equitable interest in the receivable, the Court should not require CSC to turn over the money that it receives from the state because CSC has valid recoupment rights. "Recoupment is an equitable doctrine that 'exempts a debt from the automatic stay

8

when the debt is inextricably tied up in the post-petition claim.'" *TLC Hospitals*, 224 F.3d at 1011 (quoting *United States v. Consumer Health Servs. of Am., Inc.,* 108 F.3d 390, 395 (D.C.Cir.1997)). In other words, recoupment is not limited to pre-petition claims and a creditor may use a post-petition claim to recoup for a pre-petition obligation (or vice versa). *See TLC Hospitals*, 224 F.3d at 1011. "[C]laims or rights giving rise to recoupment must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate." *Id.* (emphasis in the original). Claims arise from the same transaction – even where they might arise in a series of transactions – where the two events have a logical relationship. *See TLC Hospitals*, 224 F.3d at 1012 (citing *Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392, 1403 (9th Cir.1996)).

Here CSC plainly has recoupment rights arising from the RPA and Bills of Sale – a single integrated contract. There is a logical relationship between its payment of the purchase price for the Debtor's receivable, and the state of Arizona's payment of the receivable. Indeed, the central underpinning of recoupment is directly in play here – the inequity of allowing a debtor to enjoy the benefits of a transaction without meeting the obligations of that transaction. *See TLC Hospitals*, 224 F.3d at 1014. The Debtor has already received the benefit of its bargain, it has received the purchase price from CSC for its receivable. To allow the Debtor to take that money, and to allow it to renege on the obligation to pay over the receivable would be inequitable. It would also undermine the business model through which many charter schools receive their funding. The Court can and should hold that CSC's recoupment rights prevent the Debtor's use of the state's May 1, 2014 payment as cash collateral. And, further, that CSC's recoupment rights allow CSC to apply the funds received from the state to the claim it has in such payments arising from the RPA/Bills of Sale.

9

### III. Requested Relief.

For the foregoing reasons, CSC respectfully requests that the Court deny the Debtor's ability to use as cash collateral the money to be paid to CSC by the state of Arizona on May 1, 2014. Further, CSC requests that the Court excuse CSC from turnover of these funds, and the funds due to CSC on June 1, and June 30, 2014, under CSC's recoupment rights.

DATED this 30th day of April, 2014.

                                        OSBORN MALEDON, P.A.

                              By    /s/ Warren J. Stapleton
                                    Warren J. Stapleton
                                    2929 North Central Avenue
                                    21st Floor
                                    Phoenix, Arizona 85012-2793
                                    Attorneys for Osborn Maledon PA

COPY of the foregoing sent via electronic and/or U.S. mail this 30th day of April, 2014.

Office of the United States Trustee
230 N First Ave Ste 204
Phoenix AZ 85003

Eric Slocum Sparks
Law Offices of Eric Slocum Sparks, P.C.
110 S Church Ave #2270
Tucson AZ 85701
*Counsel for Debtor*

Scott B. Cohen
Bradley D. Pack
Engelman Berger, P.C.
3636 N Central Ave
Phoenix AZ 85012
*Counsel for BBVA Compass Bank*

Jose Martinez, Director
Prestamos CDFI, LLC

1024 E Buckeye Rd Ste 270
Phoenix AZ 85034

Internal Revenue Service
4041 N Central Ave Ste 112
Phoenix AZ 85012

/s/ Peggy L. Nieto
5458557v1

11